Filed 3/29/13  Sukumar v. Health Tech Resources CA4/1
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| PONANI SUKUMAR et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>HEALTH TECH RESOURCES, INC., et al.,<br><br>    Defendants and Respondents. | D054985<br><br><br>  (Super. Ct. No. 37-2007-00052071-CU-BC-NC)<br><br>ORDER MODIFYING OPINION, DENYING PETITION FOR REHEARING AND DENYING REQUEST FOR PUBLICATION<br><br>**NO CHANGE IN JUDGMENT** |

THE COURT:

The opinion filed March 11, 2013 is modified as follows:

Page 1, second paragraph, second sentence, is modified as follows:  The equipment was manufactured in Italy by Air Machine ~~Com~~ SRL, an Italian company (SRL).  It shall now read:  The equipment was manufactured in Italy by Air Machine SRL, an Italian company (SRL).

The petition for rehearing has been considered by Justices Benke, Huffman and Irion and is denied. Justice Benke would grant rehearing.

The request for publication has been considered by Justices Benke, Huffman and Irion and is denied. Justice Benke would grant the request for publication.

THERE IS NO CHANGE IN JUDGMENT.

HUFFMAN, Acting P. J.

Copies to: All parties

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| PONANI SUKUMAR et al., | D054985 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2007-00052071-CU-BC-NC) |
| HEALTH TECH RESOURCES, INC., et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of San Diego County, Michael B. Orfield, Judge.  Affirmed.

Ponani Sukumar entered into a contract with Health Tech Resources, Inc. dba Impact Fitness Systems (Health Tech) whereby Sukumar purchased certain exercise equipment.  The equipment was manufactured in Italy by Air Machine Com SRL, an Italian company (SRL).  Because he believed the exercise equipment was defective, Sukumar, along with his physical rehabilitation clinic Southern California Stroke

Rehabilitation Associates (SCSRA) brought suit against multiple defendants,[1] including Health Tech, Thomas Eggers (Health Tech's president and owner), and SRL. SRL moved to quash service of summons because of a lack of personal jurisdiction, and the court granted the motion.

Sukumar and SCSRA appeal, arguing the court erred in finding that SRL was not subject to personal jurisdiction in California. Specifically, they argue SRL purposefully availed itself of the benefits of doing business in California, their suit relates to SRL's contacts with California, and SRL did not show the superior court's exercise of jurisdiction in this matter would be unreasonable. In the alternative, Sukumar and SCSRA contend SRL waived its jurisdictional objection by engaging in discovery unrelated to jurisdictional issues. We affirm.

---

[1]  Panatta Sport SRL (Panatta) and Air Machine Com SRL (COM) were also named defendants in the action. Like SRL, both defendants moved to quash service of summons. The trial court denied their separate motions, however, ruling they waived their jurisdictional objections by serving Sukumar with a settlement offer pursuant to Code of Civil Procedure section 998. Panatta and COM challenged this ruling by filing a writ petition. (*Air Machine v. Superior Court* (July 2, 2010, D054878).) We granted the requested writ relief, held their settlement offer did not waive their challenge to jurisdiction and remanded the matter for further consideration. The trial court thereafter granted on the merits the motions to quash of Panatta and COM, which Sukumar has separately appealed. (*Sukumar v. Air Machine, et al* (D060743), filed concurrently.) We subsequently denied Sukumar's opposed motion to consolidate the instant appeal with D060743. We issue this date a separate nonpublished opinion in D060743, affirming the trial court's order granting the motions to quash of Panatta and COM.

2

FACTUAL AND PROCEDURAL BACKGROUND

We glean the facts from the evidence submitted in support of and in opposition to SRL's motion to quash.[2] Our ability to gather the pertinent facts was somewhat hindered by the state of the record. The parties disputed many of the relevant facts bearing on the existence of jurisdiction, and Sukumar and SCSRA's appendix omitted some of the key pleadings and evidence that supported the court's order in this matter. In an appeal of a court's order on a motion to quash, we review the superior court's factual findings of disputed facts under a substantial evidence standard. (*People v. Mickey* (1991) 54 Cal.3d 612, 649.) As such, the record should include the evidence that supports the court's determination, not just that which support's the appellants' position. Fortunately, SRL's respondent's appendix filled in the evidentiary gaps, and we had an appropriate record on which to review the court's order.

Sukumar's Introduction to SRL

In 1997, Sukumar began investigating the utility of medical grade exercise equipment, initially as a means of helping his then ailing father recover from a symptomatic stroke. Around this time, Sukumar also pursued a business, SCSRA, focused on physical rehabilitation through weight resistance techniques. Sukumar visited several suppliers and traveled to trade shows featuring exercise equipment, including a

---

[2]     The trial court sustained and overruled various objections made by both parties to the evidence each proffered in support of and in opposition to SRL's motion to quash. On appeal, neither party has challenged the trial court's evidentiary rulings.

show in Las Vegas, Nevada in 1998. At the Las Vegas trade show, Sukumar met Bill Kazmaier, an independent distributor of exercise equipment, including SRL's products. Sukumar requested catalogs of SRL's equipment and related information. Kazmaier relayed Sukumar's request to SRL. SRL sent catalogs and related literature to Sukumar.

SRL was a manufacturer of exercise equipment based in Italy. It is undisputed that SRL never registered to do business in California; designated an agent for service of process in California; opened any financial or bank account in California; owned, rented or leased any real property in California; or occupied offices in California.

In October 1999, SRL's export manager, Michael Taddese, called Sukumar and told him that Taddese had heard through Kazmaier that Sukumar was interested in SRL's exercise equipment and products and asked Sukumar if there were any additional questions he needed answered about the equipment. Taddese also faxed Sukumar a letter on company letterhead stating that SRL was "interested in continu[ing] the eventual relationship hoping both Companies have a mutual interest" and "looking forward to hearing from you [Sukumar] soon," and that SRL would be sending Sukumar a catalog of SRL's products, a flyer for its network system and operation manuals, among other items. Taddese explained that he sent the letter to Sukumar in response to Sukumar's request after their telephone conversation.

In March 2001, Francesco Fantini, a representative of SRL, attended a trade show in San Francisco to make contacts for potential distributors around the world. After the trade show, SRL sent letters to entities interested in becoming a distributor of SRL's exercise equipment.

4

### Health Tech Becomes a Distributor of SRL Products

After the San Francisco trade show, which Eggers attended, Eggers expressed interest in becoming in becoming a U.S. distributor for SRL products. SRL subsequently sent Eggers a letter stating it was "enthusiastic in starting a business relationship with you" and "firmly believe[d] in the development of the U.S.A. market." SRL also provided Eggers with Sukumar's contact information.

Ultimately, Eggers, on behalf of his company Health Tech, signed a distributor agreement with SRL in January 2004. The distributor agreement established Health Tech as a distributor with the right to sell SRL's product within a defined territory and SRL as a supplier of the products to be sold. It also made clear that Health Tech was to be an independent contractor with no authority to act on behalf of SRL (including entering into binding contracts on SRL's behalf), and any litigation arising out of the distributor agreement was to take place in Italy and be governed by Italian law. In addition, the distributor agreement prevented SRL from selling directly to customers in the distributor's territory, unless Health Tech granted SRL permission to do so.

### Sukumar Reaches an Agreement With Health Tech to Purchase SRL Exercise Equipment

Eggers subsequently made contact with Sukumar and provided Sukumar with information and a price list in September 2001. At that time, Sukumar had hired Frank Smith as a consultant. In September 2001, SRL sent Smith a CD-rom containing updated product information and a price list. Later that month, Smith received a copy of a proposal from Eggers to Sukumar. Taddese was copied on the proposal as well. Among

other things in the proposal, Eggers informed Sukumar that "[t]o address the very important issue of service, [SRL] will have [its] chief engineer to assist with your entire installation and set up, as well as provide 'hands on' detailed training sessions for your service personnel."

In May 2002, Taddese and David Sanson (also of SRL) traveled to Kansas to meet with Eggers to discuss further the possibility of Eggers and/or his company, Health Tech, becoming a distributor of SRL's products. Because Sukumar kept asking Eggers technical questions about SRL's products, Eggers asked Taddese and Sanson to accompany him to visit Sukumar in San Diego. It is undisputed that Taddese, Sanson, and Eggers flew to San Diego and met with Sukumar and William Stout, who at the time owned a fitness supply and service company in San Diego. Sukumar and SRL presented very different versions of what occurred at this May 2002 meeting.

In opposing the motion to quash, Sukumar submitted his declaration. According to this declaration, during the May 2002 meeting, Taddese and Sanson provided Sukumar with information relating to the SRL equipment, including a "guarantee" concerning SRL's products. Taddese and Sanson urged Sukumar to purchase SRL equipment, which they described as being "high quality." Taddese also told Sukumar that SRL wanted a showroom for its Air Machine product line and suggested that one of the clinics Sukumar intended to open in California could serve that purpose.

Sukumar told Taddese and Sanson during their meeting that he would not purchase any SRL equipment unless there was a factory-trained technician in San Diego to address maintenance and repair issues involving the equipment. In response, the "SRL

6

representatives" agreed that SRL would train Stout at its factory in Italy so Stout could service the equipment following its delivery in California.

During this same meeting, Sukumar also discussed the status of certain "projects" between him and SRL.

SRL presented evidence that painted an entirely different picture of the May 2002 meeting. SRL provided a declaration from Taddese that stated he and Sanson made clear to Sukumar that they were present only at the request of Eggers to answer technical questions about SRL's products and any "purchases or dealings" concerning SRL's products would have to go through Eggers. In addition, Taddese stated the discussion at the May 2002 meeting was limited to: technical issues about SRL's products; SRL's competitors' products and possible ways to test those products for certain functions; and Sukumar's future plans and the reasons for his interest in SRL's products. According to Taddese, Sukumar was concerned about spare parts for SRL's exercise machines and was told that the distributor agreement between Health Tech and SRL required Health Tech, as the distributor, to maintain adequate spare parts. Sukumar also asked about pricing if he purchased the entire line of product, and Eggers assured him the pricing would be competitive. In addition, Sukumar wanted Stout to be trained at SRL's factory in Italy. Eggers assumed that it could be arranged and Taddese stated that he did not see any

7

reason Stout could not visit SRL's factory.[3]  However, Taddese stated that SRL did not have a formal training program or "certified" factory service providers.  Taddese did not offer to pay for Stout's training in Italy.

SRL also submitted the declaration of Sanson, which supported much of Taddese's declaration.  Among other things, Sanson declared:  "At the May [2002] Meeting it quickly became apparent that Mr. Sukumar was a technical minded person, likely trained as an engineer, and one who had made an intensive study of exercise equipment.  Much of our meeting time was taken up by extended theoretical questions about the machines, including competitive products.  Mr. Sukumar wanted to know if various testing protocols had been established or if they could be.  I advised him that such testing as he described was not something that [SRL] did, but that I believed some University professors in Italy might be interested and that I would put him in contact with them.  I later did this as a courtesy to him and there was a proposal by Mr. Taddese's Company (GLOBAL SOLUTION, a company established by Mr. Taddese after he left SRL, and absolutely unrelated to SRL).  This proposed testing and study was never part of [SRL's] function and no agreement was entered into between SRL and Sukumar."

In August 2003, Eggers sent a written proposal to Sukumar for about $156,000 of SRL equipment.  The proposal had SRL's logo[4] on the front and included a diagram

---

[3]     In his supplemental declaration, Stout clarified that he had done previous service work for Sukumar on other products and Sukumar wanted Stout to be "factory trained to work on [SRL] products."

8

prepared by Sanson, at Eggers's request, showing the positioning of SRL's Tech Line of equipment at Sukumar's facility located in Solana Beach. The written proposal also stated the equipment was to be purchased from Health Tech, which would be responsible for shipping the equipment from Italy to San Diego. The proposal indicated that "[SRL] will fly Mr. Billy Stout to the factory to be trained and certified as a professional [SRL] technician."

Sukumar claimed SRL directly sent him two separate, written proposals dated October 27, 2003, regarding its exercise equipment. In his declaration, Sukumar contended "SRL recently produced [the written proposals] to my attorneys in this case." SRL, however, produced evidence that these written proposals were never made to Sukumar, but they instead were provided to Eggers for his prospective order with Sukumar. The written proposals listed the price of the products in Euros and included a distributor discount of 25 percent of the list price. In addition, the written proposals indicated the equipment would be delivered in Italy.

In December 2003, Eggers sent Sukumar a revised proposal that included the SRL logo on the front of the document. It reiterated many of the other terms and conditions as the August 23, 2003 proposal. However, the December 2003 proposal stated "[SRL] will include spare parts for inventory based on the Tech Line Isotonic machines in San Diego to support any needed warranty parts and work for two years."

---

4 Eggers's assistant added the SRL logo to the document.

After Eggers signed the distributor agreement with SRL, he wrote Sukumar and "confirm[ed]" that "any legal disputes between [Eggers's company,] Health Tech Resources, Inc.-Air Machine and P.N. Sukumar [would] be conducted in San Diego . . . ." Sukumar declared he wanted assurances before purchasing the SRL equipment that any dispute involving such equipment would be conducted in San Diego and not in Italy because the equipment was going to be physically located in San Diego.

On February 26, 2004, Eggers sent Sukumar a "Contractual Agreement for Air Machine Order" (purchase agreement), in which Sukumar agreed to purchase more than $120,000 of SRL equipment and product from Health Tech. Among other things, the purchase agreement stated that after receipt of "the initial 50% down payment" Health Tech "will fly . . . Stout . . . to the factory in Italy to be trained and certified on the entire Tech line of Air Machines both Isotonic and Cardio Lines." The purchase agreement also reiterated that "any litigation about the quality of the Air Machine or manufacturing defect[s] or any other . . . issues" involving Sukumar, Eggers, or SRL would be conducted in San Diego California, "regardless of the legal jurisdiction as may be interpreted in the distributor[ship] agreement between [SRL and Health Tech] . . . ."

Sukumar admitted that in connection with the purchase agreement, he also received from Eggers a copy of the distributor agreement. Sukumar stated he did not read that agreement, but instead relied on it as proof of the existence of a formal relationship between Eggers and SRL, which Sukumar declared was then a primary concern to him. Also of importance to Sukumar was the fact Eggers "spoke for SRL," which Sukumar testified was confirmed both by Eggers and SRL employees. However,

Sukumar signed each page of the copy of the distributor agreement he was given and noted on the last page that he had "seen all 9 pages start to finish."

After signing the purchase contract, Sukumar insisted that Eggers, on behalf of Health Tech, sign an addendum. The addendum included the following provisions:

> "Whereas, the parties to the 2/26/04 Agreement intended that Health Tech act on behalf of and bind [SRL] to the terms and conditions of the 2/24/04 [sic] Agreement;
>
> "Whereas, the Distributorship Agreement between [SRL] and Health Tech executed on 1/16/04, Article 4 states:
>
> " 'The Distributor (Health Teach Resources Inc.) is not entitled to act in the name of or on behalf of the Supplier [SRL] and has no authority to bind the Supplier towards third parties;
>
> "Whereas, the intent of [SRL], the Supplier in the Distributorship Agreement of 1/16/04 is to modify that Agreement, ratify the 2/26/04 Agreement and be bound by the terms of the 2/24/04 Agreement.
>
> "[SRL] hereby agrees to be bound by the terms and conditions agreed to by its Distributor, Health Tech in the 2/26/04 Agreement and waives the provisions of Article 4 of the 1/16/04 Distributorship Agreement for the purposes of the 2/26/04 Agreement."

Both Sukumar and Eggers (on behalf of Health Tech) signed the addendum. SRL did not. Curiously, the addendum referred to specific language in the very distributor agreement Sukumar claimed to never have read.

In May 2004, Stout traveled to SRL's factory in Italy to be trained to service SRL's products. However, Stout admitted that it was Eggers who contacted him about going to

11

Italy to be trained, and Stout did not know who paid for his travel and lodging costs.[5]

Sukumar received the SRL exercise equipment in January 2005, "almost a year late." SRL subsequently shipped spare and replacement parts directly to Stout in San Diego.

In late 2006, SRL apparently shipped spare parts direct from Italy to a company called Advantage Fitness Products.

The Dispute

After taking delivery, Sukumar found multiple problems with the equipment including, among other things, missing parts, software that did not work as contemplated, and improper color schemes on the "movement arms" of the equipment and its upholstery. Over the next several months, Eggers unsuccessfully attempted to resolve these problems to the satisfaction of Sukumar.[6]

---

[5] Stout submitted two declarations in regard to SRL's motion to quash. In his first declaration filed in support of the opposition to the motion to quash, he declared that SRL "took care of my transportation in Italy, and paid for my hotel and for several meals." In a supplemental declaration submitted in support of the motion to quash, Stout admitted he did not understand the purpose of his original declaration and was led to believe it was just to confirm what he stated in his deposition. He further stated that his original declaration was prepared entirely by Sukumar's attorneys. Stout acknowledged that SRL's attorneys typed and prepared his supplemental declaration, but he had been advised to carefully review and change anything not accurate or actually within his personal knowledge. He further admitted that there was never an agreement between him and SRL, and he had never been paid by SRL. Finally, he stated that the only SRL product in the United States that he worked on had been Sukumar's.

[6] The trial court sustained SRL's hearsay and lack of foundation objections to the evidence proffered by Sukumar regarding Eggers's alleged statements that he was working with SRL to resolve the problems with the exercise equipment, that those

Sukumar's operative complaint asserted causes of action against SRL, among other defendants, for breach of contract, breach of express and implied warranties, breach of the implied covenant of good faith and fair dealing, violation of Business and Professions Code section 17200 et seq., and promissory estoppel. The basis of the complaint against SRL was that it manufactured exercise equipment at its factory in Italy that had multiple defects, making the equipment unusable for Sukumar's planned rehabilitation clinic or clinics.

Motion to Quash

SRL moved to quash service on the basis it lacked sufficient minimum contacts with California to subject it to jurisdiction in this state. SRL argued that it never conducted business in California. It emphasized that it signed a distributor agreement with Health Tech, and Health Tech sold SRL's equipment to Sukumar. SRL also argued Health Tech had no authority to bind SRL and that all of SRL's contact with Sukumar was at Sukumar's or Eggers's request.

Sukumar and SCSRA opposed the motion to quash, arguing primarily that SRL and Health Tech worked together to complete the sale of exercise equipment. Sukumar and SCSRA contended SRL directly solicited Sukumar and then used a distributor toward the end of the sales efforts to shield SRL from having to litigate any disputes in California.

---

problems would be fixed even if it meant replacing some of the equipment and/or their parts and, if all else failed, that SRL would take back the equipment under its warranty.

After considering the pleadings, evidence, and objections to evidence submitted in support of and in opposition to the motion to quash and hearing oral argument, the court granted SRL's motion. The court found Sukumar "provided insufficient evidence that: (1) Defendant SRL had purposefully availed itself of the forum benefits with respect to the matter in controversy; (2) the controversy is related to or arises out of defendant's contacts with the forum; and (3) the exercise of jurisdiction would comport with fair play and substantial justice."

Specifically, the superior court found it undisputed that SRL: "Has never registered to do business in California; [¶] [n]ever designated an agent for service of process in California; [¶] [n]ever had any financial accounts in California; [¶] [n]ever owned, rented or leased any real property in California; [¶] [n]ever had offices in California; [¶] [n]ever contracted with anyone in California; [¶] [d]oes not market or advertise its products in the US [except through an apparently non-interactive website and through independent distributors]; [¶] [d]oes not have employees in the US, only a distributor in Kansas; [¶] [s]old its products in such a manner as to have the distributors take possession of the product in Italy, and distributors arranged for all shipping to the US; [and] [¶] Plaintiff [Sukumar] never paid SRL directly for any product."

The superior court further found that SRL attempted to distance itself from the California market as follows: "1) by being careful to sign no contracts with California or other US residents directly; 2) by arranging for an independent distributor to serve any customers in the US, and to serve the Plaintiff in California; 3) by specifically providing in the Distributor Agreement that Kansas distributor had no authority to bind SRL per

14

[that] Agreement [citation]; 4) by specifically providing in the Distributor Agreement Italian law is to govern the relationship between the Distributor and SRL; and 5) by being very careful in its contracts and dealings with distributors, to have the distributor be responsible for the product once the distributor takes possession of it (per the 'ex works' designation on the bills of lading) in Italy."

As to the issue of purposeful availment, the trial court found Sukumar's evidence "unpersuasive," ruling as follows:

> "There is evidence Defendant SRL contracted with Thomas R. Eggers to be its independent distributor on [January 1, 20]04 [citation]. However, the evidence is that Eggers was, in fact, independent of SRL and not controlled by SRL[.] [¶] There is evidence that at the time SRL contracted with Mr. Eggers, SRL had already established some contacts directly with Plaintiff Sukumar in California which eventually culminated in a purchase by Sukumar of [SRL] product of approximately $100,000.00 in 2004. However, in each case, the court finds that the contact with Sukumar was initiated and orchestrated by Sukumar and not by SRL.

> "For example: [¶] a) The telephone call from Michael Taddese, [SRL's] Export Manager, to Sukumar in 1999 was in response to an inquiry by Mr. Sukumar [citation]; [¶] b) the fax dated [October 26, 19]99 from Taddese to Sukumar involving various manuals, marketing information, and price quotes for SRL's 'Air Machine' exercise equipment was in response to a request for same by Sukumar [citation]; [¶] c) a two-hour meeting between SRL's employees Taddese and Sanson on the one hand, and Plaintiff, on the other hand, in May of 2002 or 2003 was held in San Diego. Also present were Thomas Eggers and William Stout. However, there is evidence that the SRL representatives were in Kansas for a meeting with their distributor, Eggers, and were requested by Eggers to extend the trip to include a trip to San Diego to answer technical questions for Mr. Sukumar that Eggers was unable to address himself; d) an informal agreement was arranged between the SRL representatives, distributor Eggers, Plaintiff and Plaintiff's service representative, William Stout, that SRL would allow Stout at an unspecified time in the future to, visit the factory in Italy for training

15

on how to service the Air Machine products. [Citation.] However, Sukumar has admitted that he insisted on this arrangement as a condition of purchasing product from Eggers. It is not clear that SRL's participation was anything more than as a concession to its distributor to assist Eggers in his dealings with Sukumar; [and e)] At Eggers' request and as a service provided to distributors, SRL provided a proposed layout for the products ordered by Eggers for Sukumar on [August 23, 20]03 [citations]. However, again, there is evidence that the layout was done for Distributor Eggers by SRL, not directly for Sukumar.

"Based on the foregoing, the court finds that SRL did not purposefully avail itself of forum benefits, but made every effort to divert any such benefits away from SRL directly to its distributor. Further, contacts between SRL and Sukumar were not 'purposeful' in the sense that SRL sought Sukumar out. Rather, Sukumar aggressively sought SRL out."

With respect to the requirement the contacts "arise out of" or "are related to" the action, the court found: "[T]his controversy is not related to and does not arise out of the defendant's contacts with California. Rather, this controversy arises almost exclusively with Plaintiff's contacts with Italy through independent distributor Eggers."

Finally, with respect to the requirement the exercise of jurisdiction by California comport with fair play, the court found the exercise of jurisdiction in California would not be "fair or reasonable," inasmuch as "SRL went to great lengths to limit its exposure. It curtailed direct sales of its products to customers, including distributors, who agreed to take responsibility for the product in Italy. It created a Distributor Agreement in this case, to give notice to everyone concerned that Eggers was to be the responsible party to Sukumar for the product, and that SRL would deal directly only with Eggers. It used considerable restraint in interjecting itself into the relationship between Eggers and the California Plaintiff, dealing directly [with] Plaintiff only at Plaintiff's insistence. The

16

burden on SRL to defend the action in California, without employees or representatives here, would be disproportionate to its contacts. Last, this is an issue of international commerce over which California has no more interest than Italy. The tort causes of action mounted by Plaintiff are not for personal injury, but are, again, business torts that can be just as easily adjudicated in Italy."

Sukumar and SCSRA timely appealed the court's order.

DISCUSSION

I

*LIMITS OF ASSERTING JURISDICTION*

"State courts will assert personal jurisdiction over nonresident defendants which have been served with process only if those defendants have such minimum contacts with the state to ensure that the assertion of jurisdiction does not violate ' " ' "traditional notions of fair play and substantial justice." ' " ' [Citations.] 'It is well-established that only " ' "random," "fortuitous," or "attenuated" contacts' " do not support an exercise of personal jurisdiction. [Citation.] In analyzing such issues, the courts have rejected any use of " 'talismanic jurisdictional formulas.' " [Citation.] Rather, " ' "the facts of each case must [always] be weighed" in determining whether personal jurisdiction would comport with "fair play and substantial justice." ' [Citation.]" [Citation.]' " (*CenterPoint Energy, Inc. v. Superior Court* (2007) 157 Cal.App.4th 1101, 1117 (*CenterPoint*).)

"Minimum contacts" may support either general or specific jurisdiction. (*Aquila, Inc. v. Superior Court* (2007) 148 Cal.App.4th 556, 569.) Sukumar and SCSRA do not argue SRL is subject to the superior court's general jurisdiction. Instead, they argue

17

SRL's contacts with California subject it to specific jurisdiction in San Diego County superior court. " ' "Specific jurisdiction results when the defendant's contacts with the forum state, though not enough to subject the defendant to the general jurisdiction of the forum, are sufficient to subject the defendant to suit in the forum on a cause of action related to or arising out of those contacts. [Citations.] Specific jurisdiction exists if: (1) the defendant has purposefully availed itself of forum benefits with respect to the matter in controversy; (2) the controversy is related to or arises out of the defendant's contacts with the forum; and (3) the assertion of jurisdiction would comport with fair play and substantial justice." [Citation.]' " (*CenterPoint*, *supra*, 157 Cal.App.4th at p. 1117, italics omitted; *Helicopteros Nacionales de Columbia v. Hall* (1984) 466 U.S. 404, 414-415 [in determining whether specific jurisdiction exists, courts generally look to the relationship among the defendant, the forum, and the litigation].)

II

*BURDEN OF PROOF AND STANDARD OF REVIEW*

"When a nonresident defendant challenges personal jurisdiction, the plaintiff must prove, by a preponderance of the evidence, the factual basis justifying the exercise of jurisdiction. [Citation.] The plaintiff must do more than merely allege jurisdictional facts; the plaintiff must provide affidavits and other authenticated documents demonstrating competent evidence of jurisdictional facts. [Citation.] If the plaintiff does so, the burden shifts to the defendant to present a compelling case that the exercise of jurisdiction would be unreasonable. [Citation.]" (*BBA Aviation PLC v. Superior Court* (2010) 190 Cal.App.4th 421, 428-429.) "In this analysis, the merits of the complaint are

18

not implicated." (*F. Hoffman-La Roche, Ltd. v. Superior Court* (2005) 130 Cal.App.4th 782, 794.)

"Where the evidence of jurisdictional facts is not in conflict, we independently review the trial court's decision. [Citation.] To the extent there are conflicts in the evidence, we must resolve them in favor of the prevailing party and the trial court's order." (*Malone v. Equitas Reinsurance Ltd.* (2000) 84 Cal.App.4th 1430, 1436.) We review the trial court's resolution of factual conflicts under the substantial evidence standard. (*People v. Mickey*, *supra*, 54 Cal.3d at p. 649; *Integral Development Corp. v. Weissenbach* (2002) 99 Cal.App.4th 576, 585.) Under this standard, "the power of an appellate court begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact." (*Grainger v. Antoyan* (1957) 48 Cal.2d 805, 807, italics omitted.) " '[S]ubstantial evidence' is . . . evidence . . . 'of ponderable legal significance, . . . reasonable in nature, credible, and of solid value.' [Citations.]" (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873, italics omitted.) Such evidence may be in the form of declarations. (*Atkins, Kroll & Co. v. Broadway Lumber Co.* (1963) 222 Cal.App.2d 646, 654.) "We emphasize that the test is not the presence or absence of a substantial conflict in the evidence. Rather, it is simply whether there is substantial evidence in favor of the respondent. If this 'substantial' evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld. As a general rule, therefore, we will look only at the evidence and reasonable inferences supporting the

19

successful party, and disregard the contrary showing." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631, italics omitted.)

However, the dissent asserts that we err in applying a substantial evidence standard of review here to what it believes is "an overarching question of law." (Dis. opn., *post*, at p. 1.) The dissent proceeds to apply its independent standard of review, reweighing evidence, making credibility determinations, and ignoring the superior court's resolution of conflicting evidence. We are unaware of any accepted standard of review that allows us to engage in tasks that generally belong to the superior court. Further, there is nothing talismanic about the determination of jurisdiction that either transforms an appellate court into a trial court or warrants the creation of a new standard of review.

In addition, it is clear that the dissent misreads our opinion here. As we discuss below, after reviewing the superior court's findings of fact under a substantial evidence standard, we independently review the superior court's conclusions as to the legal significance of these facts. (See *Aquila, Inc. v. Superior Court* (2007) 148 Cal.App.4th 556, 568.)

III

*SPECIFIC JURISDICTION*

A. Purposeful Availment

The first prong, purposeful availment of forum benefits, is established if a nonresident defendant has "purposefully directed" its activities at forum residents, "purposefully derived benefit" from forum activities, or "purposely availed" itself of the privilege of conducting activities within the forum state, thus invoking the benefits and

20

protections of the state's laws. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 446, citing *Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 472–473, 475.)

" '[P]urposeful availment . . . focuses on the defendant's intentionality.' " (*Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 269.) Courts look to the "nature and quality of the activity in the forum state" and not to the quantity of a defendant's contacts when determining whether a defendant is subject to specific jurisdiction in a forum. (See e.g., *As You Sow v. Crawford Laboratories, Inc.* (1996) 50 Cal.App.4th 1859, 1869 (*As You Sow*).) Once satisfied, this prong ensures a defendant will not be required to defend itself in a jurisdiction by reason of "random, fortuitous or attenuated contacts" in that forum. (*Burger King Corp. v. Rudzewicz, supra,* 471 U.S. at p. 475.)

The purposeful availment prong has been extensively litigated; in some cases a single act by the defendant is sufficient if it creates a substantial contact with the forum. (See *McGee v. International Life Ins. Co.* (1957) 355 U.S. 220, 223 [concluding a single interaction by a nonresident defendant with a California insured, in which the defendant assumed the insurance obligations of another insurer and accepted the payments from the California insured was sufficient minimum contacts to subject defendant to specific jurisdiction in California, despite the fact the defendant did not focus on, or advertise or intend to do business in, California].)

We began our analysis with a review of the superior court's minute order wherein the court found that Sukumar and SCSRA did not carry their burden of proof in showing that SRL purposely availed itself of the forum benefits of California. The court listed

21

several undisputed facts bearing on this issue. Specifically, the court found SRL: never registered to do business in California; never designated an agent for service of process in California; never had any financial accounts in California; never owned, rented or leased any real property in California; never had offices in California; never contracted with anyone in California; did not market or advertise its products in the US (except through an apparently noninteractive website and through independent contractors); did not have employees in the United States, only a distributor in Kansas; sold its products in such a manner as to have the distributors take possession of the product in Italy, and distributors arranged for all shipping to the United States; and was never paid directly by Sukumar for any product. Sukumar and SCSRA do not dispute these facts, and we are satisfied that substantial evidence supports these findings.

The court also found SRL had "made every effort to distance itself legally from the California market." It based this finding on four factual findings. First, SRL was careful to refrain from directly signing any contracts with California or other United States residents. Substantial evidence supports this finding. The purchase contract was between Sukumar and Health Tech only. Both Sukumar and Health Tech signed an addendum that appears to be intended to bind SRL by the terms of the purchase agreement, but there was no evidence that SRL ever signed the addendum or any other contract with a California resident.

Second, SRL arranged for an independent distributor to serve any customers in the United States, including Sukumar. This fact also is supported by substantial evidence. It

is undisputed that SRL entered into a distributor agreement with Health Tech in January 2004.

Sukumar, however, contends Health Tech's president, Eggers, encouraged Sukumar to purchase SRL products prior to the distributor agreement being signed, and thus, Eggers's acts should be attributable to SRL for the purposes of establishing specific jurisdiction. We agree with Sukumar that activities taken on behalf of a defendant may be attributed to the defendant for purposes of personal jurisdiction. (*Anglo Irish Bank Corp., PLC v. Superior Court* (2008) 165 Cal.App.4th 969, 974 (*Anglo Irish Bank*).) However, it must be shown that the defendant purposefully directed those activities at the forum state.[7] (*Ibid.*) Here, Sukumar points to no evidence indicating that SRL was directing Eggers's or Health Tech's activities in California. At best, Sukumar presented

---

[7] The dissent asserts we misstate this rule because the rule does not require that a nonresident defendant direct the activities of a third party to impute the contacts of that party to the defendant. The dissent further argues that the rule as we have stated it makes it "difficult, if not impossible, to impute the contacts of an independent contractor/ distributor to a nonresident manufacturer because a person hiring an independent contractor has ' " ' "no right of control as to the mode of doing the work contracted for." ' " ' [Citations omitted.]" (Dis. opn., *post*, at p. 9, fn. 6.) We respectfully disagree. A third party's actions cannot be attributed to a defendant unless the defendant purposefully directed those activities. (*Anglo Irish Bank*, *supra*, 165 Cal.App.4th at p. 974.) In addition, the legal definition of an independent contractor would not prevent a plaintiff from showing that a defendant purposefully directed the independent contractor's activities in the forum. Here, we agree with the superior court that Sukumar did not carry his burden in this regard. The dissent reaches a different conclusion, but can only do so after reweighing the evidence and disregarding the evidence supporting the superior court's factual finding on this point. We are not permitted to engage in such activities on review of the superior court's order. (See *Howard v. Owens Corning*, *supra*, 72 Cal.App.4th at p. 631.)

evidence that SRL provided Eggers with Sukumar's contact information. Other than this fact, there is nothing in the record that would have compelled the superior court to find SRL was directing Eggers's activities in California. And Sukumar has not provided us with any authority that supports the conclusion that a defendant directed a third party's activities in the forum state merely by providing a potential customer's contact information. (See, e.g., *Anglo Irish Bank*, *supra*, 165 Cal.App.4th at p. 984 [defendant directed third party's contact with investors in California because defendant specifically asked the third party to meet with potential investors in California and defendant relied on third party's expertise both in evaluating the prospective clients and in answering questions about types of investments].) No such analogous facts exist here.

Third, the superior court found that SRL had distanced itself legally from the California market because of the terms of the distributor agreement. Specifically, the distributor agreement stated: (1) the distributor, based in Kansas (Health Tech), had no authority to bind SRL; and (2) Italian law governed the distributor agreement. We agree with the court that the distributor agreement contained these terms. In addition, we note that the addendum to the purchase agreement appeared to be aimed at these specific provisions of the distributor agreement (although Sukumar claimed to have never read the distributor agreement). Although both Sukumar and Health Tech signed the addendum, there is no evidence that SRL signed it. The existence of the addendum, nevertheless, underscores the importance of the distributor agreement in keeping SRL legally distanced from the California market. In other words, there is no reason Sukumar would have

24

wanted SRL to sign the addendum but for the existence of the terms in the distributor agreement that prevented Health Tech from acting on SRL's behalf.

Fourth, the court was persuaded by the fact SRL was careful to require Health Tech to take possession of any equipment in Italy thus making Health Tech responsible for shipping the equipment to its customers in the United States. Again, substantial evidence supports the court's factual finding.

Sukumar and SCSRA do not challenge these findings, but instead, point to a number of "contacts" they claim prove SRL purposely availed itself of the forum benefits in California. For example, Sukumar and SCSRA contend the May 2002 meeting, SRL's invitation to Stout to train at its factory in Italy, and SRL's drawing of a diagram layout for Sukumar's facility all satisfy the purposeful availment prong of the minimum contacts test. We disagree. In making this argument, Sukumar and SCSRA invite us to reweigh the evidence. We cannot do so.[8] (See *Anderson v. State Personnel Bd.* (1980) 103 Cal.App.3d 242, 251; *Maynard v. State Personnel Bd.* (1977) 67 Cal.App.3d 233, 237.)

---

[8] The dissent accepts Sukumar and SCSRA's invitation and reweighs the evidence, going so far as to make credibility determinations. For example, the dissent discounts the deposition testimony of Ricardo Piccioli, finding a letter written by Fantini about the trade show in San Francisco more credible. (Dis. opn. at pp. 12-13.) The dissent also finds Taddese's testimony not credible. (Dis. opn. at p. 19.) We are not aware of any authority that allows us to make these credibility determinations. In addition, the dissent ignores the superior court's factual findings regarding what occurred at the May 2002 meeting and accepts Sukumar's version of events instead of reviewing the superior court's specific and implied findings regarding this meeting for substantial evidence. In doing so, the dissent replaces the superior court's evaluation of the facts with its own. This is improper. (See *In re Automobile Antitrust Cases I and II* (2005) 135 Cal.App.4th 100, 113-114.)

25

Instead, we "view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court." (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.) "The fact that it is possible to draw some inference other than that drawn by the trier of fact is of no consequence." (*Ibid*.)

All three of these contacts involve disputed evidence. Although the superior court did not make specific factual findings on all of the evidence presented, it did find Sukumar's "evidence of 'purposeful availment' " "unpersuasive." As such, we resolve the disputed evidence in favor of SRL (*Malone v. Equitas Reinsurance Ltd*. (2000) 84 Cal.App.4th 1430, 1436), imply the necessary factual findings to support the court's order granting SRL's motion, and review the implied factual findings for substantial evidence (see *Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58).[9] "We have no power to substitute our own assessment of the facts for that of the trial court if substantial evidence supports [its] finding. [Citation.] That is a trial court function, not one for us as an appellate court." (*In re Automobile Antitrust Cases I and II*, *supra*, 135 Cal.App.4th at pp. 113-114.)

---

[9] The dissent ignores the doctrine of implied findings. Instead, it takes the position that if the superior court did not specifically resolve conflicting evidence with a particular factual finding, then the court of appeal may make its own factual finding to decide the disputed issue. The dissent fails to provide any authority for this approach. We find no support for it either.

26

The superior court found that Taddese and Sanson attended the May 2002 meeting at Eggers's request after they met with Eggers in Kansas to discuss distributor issues. The court also found that Taddese and Sanson answered Sukumar's technical questions that Eggers was unable to answer. These findings are supported by substantial evidence, specifically the declarations of both Taddese and Sanson. In addition, we imply the finding that the court did not deem Sukumar's declaration regarding what occurred at the May 2002 meeting convincing.[10]

In addition, Sukumar and SCSRA mischaracterize the arrangement to have Stout trained at SRL's factory in Italy. They claim that SRL invited Stout to be trained. However, the court found that Sukumar insisted that Stout be trained at SRL's factory in Italy, and SRL simply agreed to the request. This finding too is supported by substantial evidence as Taddese stated in his declaration that "Sukumar wanted to have . . . Stout . . . trained at the factory in Italy. . . . Eggers assumed that could be arranged and I agreed and saw no reason why . . . Stout could not visit [SRL's] factory."

Also, Sukumar and SCSCR insist SRL's drawing of a diagram layout for Sukumar's facility showed purposeful availment. The court disagreed, finding SRL prepared the drawing at Eggers's request and as a service SRL provided to distributors. Again, this finding is supported by substantial evidence as Sanson testified as to this in his declaration.

_____

10    Even if we did not imply this finding, we would disregard the contrary evidence in any event. (See *Howard v. Owens Corning*, *supra*, 72 Cal.App.4th at p. 631.)

The court made additional findings of fact that are all supported by substantial evidence. It found that Taddese called Sukumar in 1999 in response to an inquiry by Sukumar. The court also found Taddese sent Sukumar a fax, manuals, marketing information, and price quotes in October 1999 in response to Sukumar's request as well. Both these findings are supported by substantial evidence. In his declaration, Sukumar admitted he received a call from Taddese "[a]s [he] pursued [SRL] equipment further" and Taddese told Sukumar that he was calling him after he heard of Sukumar's interest in SRL's products from SRL's distributor and Taddese wanted to know if there were any questions he could answer. In addition, Taddese stated in his declaration that he sent the fax and related materials to Sukumar in response to his request.

Somewhat ignoring the court's findings, Sukumar and SCSRA also emphasize additional contacts that they claim prove SRL's purposeful availment. We are not persuaded.

For example, Sukumar and SCSRA assert SRL sent Sukumar two proposals in October 2003. As proof of these proposals, Sukumar and SCSRA point to two one-page documents that contain SRL letterhead and list equipment and prices. In his declaration, Sukumar states the proposals are dated October 27, 2003 and "SRL recently produced [the documents] to [his] attorneys in this case." The court did not make a specific factual finding as to these two documents. However, because it did not find that Sukumar and SCSRA proved purposeful availment, we must imply factual findings to support the order. (See *Fladeboe v. American Isuzu Motors, Inc.*, *supra*, 150 Cal.App.4th at p. 58.) In addition, as we note above, the court found Sukumar and SCSRA's evidence

28

"unpersuasive," which would include the alleged October 2003 proposals.  Here, we are satisfied that substantial evidence supports the implied findings that the alleged October 2003 proposals were never made directly from SRL to Sukumar.[11]

Sukumar did not have the proposals in his possession, but instead, admitted that SRL had recently produced them in discovery to his attorneys.  SRL provided a declaration from Tomas Bilardo, an employee of SRL, who stated the two October 2003 proposals were sent to Eggers for a perspective order from Eggers's client, Sukumar.  Bilardo's testimony is buttressed by the actual proposals themselves.  Both proposals indicate a 25 percent discount SRL gave distributors, listed the price of the equipment in Euros, and called for the equipment to be delivered in Italy.

In summary, we are satisfied that substantial evidence supports the court's stated and implied factual findings.  We independently conclude, based on these findings, Sukumar and SCSRA did not prove SRL purposefully availed itself of forum benefits.  We agree with the superior court that SRL "made every effort to divert any such benefits away from SRL directly to its distributor."  Also, we agree with the court that SRL did not seek out Sukumar, but instead, Sukumar "aggressively" pursued SRL.  Indeed, it appears from the record that SRL's direct contacts in California, outside of those requested by Eggers or Sukumar, consisted of appearing at a trade show at which it was looking for potential distributors.  We are aware that there is undisputed evidence that

_____

[11]     During oral argument, Sukumar's counsel was unsure if the October 2003 proposals were actually sent directly from SRL to Sukumar.

29

SRL directly shipped spare parts to Stout and another California business. Without greater explanation, the delivery of these spare parts is insufficient to give us pause. There is nothing in the record showing that SRL derived significant income from shipping these parts directly to California residents. (See *Bridgestone Corp. v. Superior Court* (2002) 99 Cal.App.4th 767, 777 ["We conclude that a manufacturer's placement of goods in the stream of commerce with the expectation that they will be purchased or used by consumers in California indicates an intention to serve the California market 'directly or indirectly' [citation] and constitutes purposeful availment if the income earned by the manufacturer from sale or use of its product in California is substantial."].) Also, as we discuss below, Sukumar and SCSRA did not connect these contacts with the controversy here.

In addition, we conclude that neither Eggers's acts nor Health Tech's contacts in California can be attributed to SRL for jurisdictional purposes because Sukumar and SCSRA did not prove that SRL was directing Eggers's or Health Tech's actions in California. Sukumar and SCSRA simply did not prove purposeful availment.

Sukumar and SCSRA, however, contend that this case is analogous to *Secrest Machine Corp. v. Superior Court* (1983) 33 Cal.3d 664 (*Secrest*), and thus, we must determine SRL purposefully availed itself of forum benefits. We disagree.

In *Secrest*, the plaintiff was injured while operating a leveling machine designed and manufactured by the defendant, an out-of-state corporation. The defendant did not maintain offices, employees, or property in California, and did not manufacture the leveling machine in this state. (*Secrest*, *supra*, 33 Cal.3d at p. 667.) The plaintiff's

30

employer paid over $115,000 for the machine and took delivery of it in Virginia, but the defendant sent an employee to California to help install the machine. (*Id*. at p. 668.) After the machine was installed, the defendant sent spare parts to the plaintiff's employer and gave advice on maintenance. (*Id*. at p. 671.)

*Secrest*, *supra*, 33 Cal.3d 664 is not instructive here. *Secrest* involves a claim for personal injury. Neither Sukumar nor SCSRA have alleged a cause of action for personal injury. In addition, the defendant in *Secrest* sold the defective product to a California based company for use in California. In contrast, SRL sold its exercise equipment to Health Tech, which was based in Kansas. Although Sukumar argues that SRL assisted Sukumar with the installation of its exercise equipment, we find the record ambiguous on this point. Sukumar cites to deposition testimony indicating that the deponent reviewed emails that were exchanged between Stout and an SRL representative regarding installation of the equipment at Sukumar's location. Sukumar and SCSRA fail to cite to the actual emails in the record, and we are not aware of the substance of those emails. In addition, unlike the defendant in *Secrest*, which sent an employee to California to help install the product, at most, SRL apparently had email communications with Stout regarding installation. Simply put, *Secrest*, *supra*, 33 Cal.3d 664 is distinguishable from the instant action.

Also, during oral argument, Sukumar and SCSRA's counsel stated that specific jurisdiction was established simply because SRL used a distributor to sell SRL's product in California and SRL knew its product would eventually be sold to a California resident. Sukumar and SCSRA provide no authority for their urged bright line rule. Our

31

independent research has uncovered none either. That said, we are aware that in some product liability suits, purposeful availment also has been shown when the "sale or distribution of a product ' " 'arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the [forum state's] market for the product.' " ' " (*People ex rel. Harris v. Native Wholesale Supply Co.* (2011) 196 Cal.App.4th 357, 362, italics omitted, quoting *Secrest*, *supra*, 33 Cal.3d at p. 670.) This case, however, is not a product liability suit as Sukumar has not claimed any injury from using SRL's products.

In summary, we conclude, based on the superior court's stated and implied factual findings, Sukumar and SCSRA have not proved that SRL purposeful availed itself of forum benefits.

### B. Arising Out of Forum Contacts

The second factor in determining if specific jurisdiction exists is whether the controversy is related to or arises out of the defendant's contacts with the forum. (*CenterPoint*, *supra*, 157 Cal.App.4th at p. 1117.) Here, the superior court found the controversy was not related to and did not arise out of SRL's contacts with California. We agree.

Sukumar and SCSRA insist the court erred because "SRL's contacts with California--directly and through its distributor, Eggers--deal with its marketing, sale and servicing of its exercise machines; Sukumar's lawsuit arises out of and is related to those very contacts." We are not persuaded.

Sukumar and SCSRA's argument hinges on their version of the facts without regard to the court's stated and implied factual findings. For example, they attribute all of

32

Eggers's acts to SRL for purposes of determining jurisdiction. However, in asserting this argument, Sukumar and SCSRA ignore the requirement that they bear the burden of proving SRL was directing Eggers's actions. (See *Anglo Irish Bank*, *supra*, 165 Cal.App.4th at p. 974.) As we note above, Sukumar and SCSRA did not carry their burden on this point.

Sukumar and SCSRA also contend this matter is the same as *Luberski, Inc. v. Oleficio F.LLI Amato S.R.L.* (2009) 171 Cal.App.4th 409 (*Luberski*) and *As You Sow*, *supra*, 50 Cal.App.4th 1859. Both cases are distinguishable. In addition, these cases underscore the primary fault in Sukumar and SCSRA's argument: SRL never contracted directly with Sukumar or any California company.

In *Luberski*, *supra*, 171 Cal.App.4th 409, the court found that the defendant, an Italian olive oil company, was subject to specific jurisdiction in California. (*Id*. at p. 412.) The defendant, however, directly contracted with a California company for the sale of $406,000 in olive oil and was required to ship the olive oil to California. (*Id*. at p. 415.) The plaintiff brought suit for breach of contract, money had and received, and fraud because it claimed the defendant never shipped the olive oil. (*Id*. at p. 412.)

Here, SRL did not enter into a contract with Sukumar or SCSRA, and SRL did not ship its exercise equipment to California. Indeed, the only similarity between *Luberski*, *supra*, 171 Cal.App.4th 409 and the instant matter is that both defendants are based in Italy. Other than this insignificant likeness, *Luberski* has nothing in common with the instant matter, and therefore is not instructive.

33

In *As You Sow*, *supra*, 50 Cal.App.4th 1859, the court found specific jurisdiction existed over an out-of-state paint manufacturer who made direct sales to private distributors in California on 16 separate occasions. (*Id*. at p. 1869.) The defendant was sued based on the allegations that it sold products containing cancer causing chemicals in California and failed to provide adequate warnings. No analogous facts exist here. SRL contracted with a Kansas based distributor. SRL did not make direct sales with any company in California nor did it ship its products to California. SRL has not been sued for product liability. *As You Sow*, *supra*, 50 Cal.App.4th 1859 therefore is distinguishable.

Here, all of Sukumar and SCSRA's claims arise out of Sukumar's contract with Health Tech. It is undisputed that SRL was not a party to this contract. In addition, the superior court found that SRL's contacts with California were not for the purpose of selling its products directly to California consumers, and that SRL did not direct Eggers' or Health Tech's contacts with California.[12] As we conclude above, substantial evidence supports these factual findings. In light of these findings by the court, we agree that

---

[12] Sukumar and SCSRA also failed to show that the controversy arose out of any of SRL's undisputed contacts with California, namely, SRL's participation at the San Francisco trade show, the shipment of spare parts to Stout, or the shipment of spare parts to another California company.

Sukumar and SCSRA did not carry their burden of showing the controversy was related to SRL's contacts in California.[13]

## IV

## *WAIVER*

Sukumar and SCSRA argue in the alternative that even if we determine SRL did not have sufficient minimum contacts for the superior court to exercise personal jurisdiction over SRL, SRL waived its jurisdictional challenge by engaging in expansive discovery. Specifically, Sukumar and SCSRA contend SRL's questioning of Sukumar during deposition of his previous litigation experience waived any jurisdictional objection. We disagree.

A defendant submits to the court's jurisdiction by making a general appearance in an action. (*Roy v. Superior Court* (2005) 127 Cal.App.4th 337, 341 (*Roy*).) A general appearance is one in which the defendant participates in the action in a manner which recognizes the court's jurisdiction. (*Mansour v. Superior Court* (1995) 38 Cal.App.4th 1750, 1756 (*Mansour*).) If the defendant raises an issue for resolution or seeks relief available only if the court has jurisdiction over the defendant, then the appearance is a general one. (*Id.* at pp. 1756-1757.) In general, propounding discovery constitutes a general appearance. (*Roy*, *supra*, at p. 341.)

---

[13] Because we conclude Sukumar and SCSRA did not satisfy their burden of establishing the first two factors establishing specific jurisdiction, we do not reach the third factor regarding whether the assertion of jurisdiction would comport with fair play and substantial justice.

However, a motion to quash under Code of Civil Procedure section 418.10 must be supported by evidence on the issue of the defendant's contacts with the state. (*School Dist. Of Okaloosa County v. Superior Court* (1997) 58 Cal.App.4th 1126, 1131.) The parties thus are permitted to conduct discovery on the issue prior to the hearing on the motion. (See *id*. at p. 1132.) The defendant's conduct of discovery on the jurisdictional issue, rather than the merits of the case, is not considered a general appearance in the action. (*Roy*, *supra*, 127 Cal.App.4th at p. 345, fn. 9; see *Mansour*, *supra*, 38 Cal.App.4th at p. 1757.)

Here, Sukumar and SCSRA contend SRL's lines of inquiry at Sukumar's deposition involved the merits of the suit because the questions concerned the number of lawsuits to which Sukumar had been a party, the number of lawsuits in which Sukumar was a plaintiff, the nature of the prior disputes, the identity of the defendants in those disputes, and the nature of the product involved in those disputes. The only authority Sukumar and SCSRA provide to support their position is *Factor Health Management v. Superior Court* (2005) 132 Cal.App.4th 246 (*Factor Health*).) *Factor Health*, however, is distinguishable from the instant action.

In *Factor Health*, *supra*, 132 Cal.App.4th 246, the court found the defendants waived their jurisdictional challenge because they sought discovery to oppose a motion for preliminary injunction. Because a motion for a preliminary injunction involves a determination related to the merits of the case, the court concluded the defendants' discovery would necessarily address the merits and was beyond what discovery a

36

defendant would typically seek in moving to quash under Code of Civil Procedure section 418.10. (*Factor Health*, *supra*, at p. 251.)

Here, unlike the defendant in *Factor Health*, *supra*, 132 Cal.App.4th 246, SRL was not attempting to engage in discovery involving the merits of the dispute. As we discuss above, the third factor of establishing specific jurisdiction involves the evaluation of whether the assertion of jurisdiction would comport with fair play and substantial justice. (*CenterPoint*, *supra*, 157 Cal.App.4th at p. 1117.) As such, it logically follows that SRL would explore Sukumar's previous litigation experience. Moreover, Sukumar's litigation history could have a bearing on his credibility in this matter as it appears Sukumar has had some familiarity in suing manufacturers of exercise equipment. Finally, we agree with SRL that its questioning of Sukumar's previous litigation is related to the background information that Sukumar supplied in his declaration opposing the motion to quash. Sukumar discusses his motivation for seeking "non-traditional techniques beyond the then realm of the allopathic medical community in the United States" to help his father rehabilitate. Sukumar's litigation with other companies that manufactured exercise equipment during his search would be relevant to his motivation. We see no question that clearly crossed the line into merits only discovery that would have resulted in SRL's waiver of its jurisdictional question.

Sukumar and SCSRA also contend the superior court did not rule on their waiver argument so we must remand this issue to the superior court in any event. We disagree.

Sukumar and SCSRA argued in the opposition to the motion to quash that the SRL had waived its jurisdictional objection. The court granted the motion. Although the

37

order does not specifically address the waiver argument, the court's granting of the motion implies that it did not find the waiver argument persuasive.  There is nothing in the record showing that Sukumar or SCSRA asked the court to make a specific finding of fact.  Specific findings generally are not required for orders on a motion.  (See *Ross v. Ross* (1962) 200 Cal.App.2d 229, 231.)  Nor do we see anything in the record indicating that Sukumar or SCSRA brought to the court's attention that the order did not address the waiver issue.  Further, we may affirm an order even when the record is silent as to the superior court's underlying grounds or reasons in support of the appealed order so long as the order is correct on any ground.  (*Howard v. Thrifty Drug & Discount Stores* (1995) 10 Cal.4th 424, 443.)

DISPOSITION

The order is affirmed.  SRL is awarded its costs on appeal.


HUFFMAN, J.

I CONCUR:


IRION, J.

38

J. BENKE, dissenting.

I believe the majority incorrectly applies the substantial evidence standard of review to what I believe is an overarching question of law, namely whether a nonresident defendant is subject to personal jurisdiction in California as a result of that defendant's minimum contacts in the forum state.

Here, in reviewing the entire record, I find a wealth of undisputed evidence not considered by the trial court (and thus, by the majority under the application of its substantial evidence standard of review) that in my view shows as a matter of law that defendant and respondent Air Machine SRL, an Italian Limited Company (SRL), purposefully availed itself of the benefits of the forum state based on (i) its own activities in seeking to establish a business relationship with, and in marketing and selling its state-of-the-art exercise equipment to, plaintiffs and appellants Ponani Sukumar and his physical rehabilitation clinic, Southern California Stroke Rehabilitation Associates (collectively Sukumar) and (ii) the activities of defendants Health Tech Resources, Inc., doing business as Impact Fitness Systems, a Kansas corporation, and its principal, Thomas R. Eggers (collectively Eggers),[1] which the evidence shows was a distributor of SRL equipment and was involved in a coordinated effort with SRL over the course of *years* to market and sell SRL equipment and product to Sukumar.

---

[1]    Eggers is not a party in this proceeding.

1

Because I *also* find that Sukumar's claims arose out of and/or related to the activities of SRL, that the exercise of specific jurisdiction over SRL would not be unreasonable and that the failure to exercise jurisdiction over SRL under the circumstances would be unfair to Sukumar, I would vacate the order of the trial court granting SRL's motion to quash and direct the court to enter a new order denying its motion.[2]

SPECIFIC JURISDICTION[3]

Sukumar contends that the trial court erred when it granted SRL's motion to quash because Sukumar proffered sufficient evidence to show SRL had sufficient minimum contacts to subject it to specific jurisdiction in California. I agree.

Briefly, Sukumar's operative complaint asserted causes of action against SRL, among other defendants,[4] for breach of contract, breach of express and implied warranties, breach of the implied covenant of good faith and fair dealing, violation of

---

[2]     The majority's decision not to publish this decision means that only Sukumar is adversely affected by it. In any event, the majority's decision to apply a substantial evidence standard of review to the question whether a nonresident defendant's contacts and activities in the forum state are sufficient to subject that defendant to jurisdiction in California in my opinion precludes meaningful review by us of that jurisdictional issue, as I demonstrate in this dissent, and in turn harms our citizenry, as Sukumar now must proceed in an Italian court if he is to obtain any relief from SRL.

[3]     As was true in the trial court, Sukumar does not contend in this proceeding that SRL is subject to general jurisdiction in California.

[4]     Defendants Panatta Sport SRL (Panatta) and Air Machine Com SRL (COM) were also named in the action. Panatta and COM are parties in a separate, albeit related opinion (D060743) issued by the majority this date to which I also dissent.

2

Business and Professions Code section 17200 et seq. and promissory estoppel. The basis of the complaint against SRL was that it manufactured state-of-the-art exercise equipment at its factory in Italy that had multiple defects and that made it unusable for Sukumar's planned rehabilitation clinic or clinics. SRL moved to quash service on the basis it lacked sufficient minimum contacts with California to subject it to jurisdiction in this state.

A. *Minimum Contacts and Standard of Review*

"State courts will assert personal jurisdiction over nonresident defendants which have been served with process only if those defendants have such minimum contacts with the state to ensure that the assertion of jurisdiction does not violate "'"traditional notions of fair play and substantial justice."'" [Citations.] 'It is well-established that only "'"random," "fortuitous," or "attenuated" contacts'" do not support an exercise of personal jurisdiction. [Citation.] In analyzing such issues, the courts have rejected any use of "'talismanic jurisdictional formulas.'" [Citation.] Rather, "'"the facts of each case must [always] be weighed" in determining whether personal jurisdiction would comport with "fair play and substantial justice."' [Citation.]" [Citation.]' [Citation.]" (*CenterPoint Energy, Inc. v. Superior Court* (2007) 157 Cal.App.4th 1101, 1117 (*CenterPoint*).)

"'"[M]inimum contacts"' may support either general or specific jurisdiction." (*CenterPoint*, *supra*, 157 Cal.App.4th at p. 1117, citing *Aquila, Inc. v. Superior Court* (2007) 148 Cal.App.4th 556, 569.) As relevant here, "'"[s]pecific jurisdiction results when the defendant's contacts with the forum state, though not enough to subject the defendant to the general jurisdiction of the forum, are sufficient to subject the defendant

3

to suit in the forum on a cause of action related to or arising out of those contacts. [Citations.] *Specific* jurisdiction exists if: (1) the defendant has purposefully availed itself of forum benefits with respect to the matter in controversy; (2) the controversy is related to or arises out of the defendant's contacts with the forum; and (3) the assertion of jurisdiction would comport with fair play and substantial justice." [Citation.]' [Citation.]" (*CenterPoint*, *supra*, 157 Cal.App.4th at p. 1117; see also *Helicopteros Nacionales De Colom. v. Hall* (1984) 466 U.S. 408, 414-415 [in determining whether specific jurisdiction exists, courts generally look to the relationship among the defendant, the forum, and the litigation].)

"When a nonresident defendant challenges personal jurisdiction, the plaintiff must prove, by a preponderance of the evidence, the factual basis justifying the exercise of jurisdiction. [Citation.] The plaintiff must do more than merely allege jurisdictional facts; the plaintiff must provide affidavits and other authenticated documents demonstrating competent evidence of jurisdictional facts. [Citation.] If the plaintiff does so, the burden shifts to the defendant to present a compelling case that the exercise of jurisdiction would be unreasonable. [Citation.]" (*BBA Aviation PLC v. Superior Court* (2010) 190 Cal.App.4th 421, 428–429.) "In this analysis, the merits of the complaint are not implicated." (*F. Hoffman–La Roche, Ltd. v. Superior Court* (2005) 130 Cal.App.4th 782, 794 (*Hoffman-La Roche*).)

4

Significant to the case at bar, "'"[o]n review, the question of jurisdiction is, in essence, *one of law*.[5] When the facts giving rise to jurisdiction are conflicting, the trial court's factual determinations are reviewed for substantial evidence. [Citation.] Even then, *we review independently the trial court's conclusions as to the legal significance of the facts*. [Citations.] When the jurisdictional facts are not in dispute, the question of whether the defendant is subject to personal jurisdiction is purely a legal question that we review de novo. [Citation.]" [Citations.]' [Citation.]" (*CenterPoint*, *supra*, 157 Cal.App.4th at pp. 1117-1118, italics added; see also *Hoffman-LaRoche*, *supra*, 130 Cal.App.4th at p. 794 [noting the "ultimate question whether jurisdiction is fair and reasonable under all the circumstances . . . is a legal determination warranting independent review"].)

B. *Purposeful Availment*

The first prong—purposeful availment of forum benefits—is established if a nonresident defendant has "purposefully directed" its activities at forum residents, "purposefully derived benefit" from forum activities, or "purposely availed" itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of the state's laws. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14

---

5    I do not believe the majority made an independent determination based on the entire record whether SRL engaged in sufficient activities in the forum state to subject SRL to specific jurisdiction.

5

Cal.4th 434, 446 (*Vons*), citing *Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 472–473, 475 (*Burger King Corp.*).)

"'[P]urposeful availment . . . focuses on the defendant's intentionality.'" (*Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 269.) Courts look to the "nature and quality of the activity in the forum state" and not to the quantity of a defendant's contacts when determining whether a defendant is subject to specific jurisdiction in a forum. (*As You Sow v. Crawford Laboratories, Inc.* (1996) 50 Cal.App.4th 1859, 1869 (*Crawford Laboratories*); see also *World-Wide Volkswagen Corp. v. Woodson* (1980) 444 U.S. 286, 297 (*World-Wide Volkswagen Corp.*) [whether a nonresident defendant purposefully availed itself of the benefits and protections of the forum state is evaluated by looking at whether such activities make it reasonably foreseeable to be "haled into court" in the forum state to defend itself in an action relating to its products].) Once satisfied, this prong ensures a defendant will not be required to defend itself in a jurisdiction by reason of "random, fortuitous, or attenuated contacts" in that forum. (*Burger King Corp.*, *supra*, 471 U.S. at p. 475.)

"When a manufacturer makes a direct effort to serve the market for its product in the forum state, the requisite level of foreseeability is met." (*Crawford Laboratories*, *supra*, 50 Cal.App.4th at p. 1870.) "Indeed, in *McGee v. International Life Ins. Co.* (1957) 355 U.S. 220, 222, the United States Supreme Court found California had jurisdiction over a Texas insurance company though 'so far as the record before us shows, respondent has never solicited or done any insurance business in California apart from the policy involved here.' Similarly, in *Secrest* [*Machine Corp. v. Superior Court* (1983)

6

33 Cal.3d 664, 669-670 (*Secrest Machine Corp.*)], the court found one sale in California sufficient for limited jurisdiction because the defendant specifically sold the product 'for use in California.' [Citation.]" (*Crawford Laboratories*, *supra*, 50 Cal.App.4th at p. 1870.)

Purposeful availment also has been shown when the "sale or distribution of a product '"arises from the efforts of the manufacturer or distributor to serve, directly *or indirectly*, the [forum state's] market for its product . . . ."'" (*People ex rel. Harris v. Native Wholesale Supply Co.* (2011) 196 Cal.App.4th 357, 362, quoting *Secrest Machine Corp.*, *supra*, 33 Cal.3d at p. 670, quoting *World-Wide Volkswagen Corp.*, *supra*, 444 U.S. at p. 297.)

Purposeful availment can also be shown based on contacts by a third person that may be attributed to a nonresident defendant. (See, e.g., *Bridgestone Corp. v. Superior Court* (2002) 99 Cal.App.4th 767, 776 (*Bridgestone Corp.*).) Myriad courts have applied the rule that a nonresident defendant's sales to California distributors or other efforts to market a product to customers in this state indirectly through an intermediary constituted economic activity within California when the defendant earned gross income from the activity. (See, e.g., *Crawford Laboratories*, *supra*, 50 Cal.App.4th at p. 1871; *Furda v. Superior Court* (1984) 161 Cal.App.3d 418, 424; *St. Joe Paper Co. v. Superior Court* (1981) 120 Cal.App.3d 991, 999-1000.)

For example, in *Crawford Laboratories* the court held that a manufacturer whose only contacts with California were through a series of sales to California distributors over a period of six years was subject to personal jurisdiction because the sales to California

distributors reflected an effort to benefit from the California market and constituted economic activity within California """as a matter of commercial actuality.""" (*Crawford Laboratories*, *supra*, 50 Cal.App.4th at p. 1871, quoting *Secrest Machine Corp.*, *supra*, 33 Cal.3d at p. 669.)

The majority recognizes the principle that the contacts of an intermediary can be attributed to a nonresident defendant to establish jurisdiction over that defendant, but states this rule does not apply in the instant case because Sukumar "did not prove that SRL was directing *Eggers's* . . . actions in California." (Maj. opn. *ante*, at p. 30, italics added.)

In my view, the majority misstates the applicable rule. "[A]ctivities that are undertaken on behalf of a defendant may be attributed to that defendant for purposes of personal jurisdiction if the defendant purposefully directed those activities toward the *forum state*. [Citations.]" (*Anglo Irish Bank Corp., PLC v. Superior Court* (2008) 165 Cal.App.4th 969, 981, italics added.) Thus, the rule does not require that a nonresident defendant direct the activities of a *third party* in order to impute the contacts of that party to the defendant, as the majority states.[6]

---

6       If the rule was as stated by the majority, it would be difficult, if not impossible, to impute the contacts of an independent contractor/distributor to a nonresident manufacturer because a person hiring an independent contract has """*no right of control as to the mode of doing the work contracted for*.""" (*Privette v. Superior Court* (1993) 5 Cal.4th 689, 693, italics added; see also *White v. Uniroyal, Inc.* (1984) 155 Cal.App.3d, 1, 24 ["An 'independent contractor' is generally defined as a person who is employed by another to perform work; who purses an 'independent employment or occupation' in

As discussed *post*, although I conclude SRL's own activities with respect to Sukumar are sufficient to subject it to specific jurisdiction in California, I further conclude that Eggers's activities in the forum state *also* should be attributed to SRL because the record shows there was a coordinated effort between SRL, the manufacturer, and Eggers, the distributor, to engage in commercial activity in the forum state, to wit: to market and sell to Sukumar state-of-the-art exercise equipment and product manufactured by SRL.  (See *Burger King Corp.*, *supra*, 471 U.S. at p. 479, fn. 22 [jurisdiction is proper over a nonresident defendant when that defendant was a "'primary (participant)' in the enterprise"].)

1. *SRL Purposefully Availed Itself of the Benefits of the Forum State*

Here, the majority in my view impermissibly reviews SRL's activities in the forum state with 20-20 hindsight and also ignores or trivializes many of the other undisputed jurisdictional facts under the guise of the sufficiency of the evidence standard of review.

In my review of the entire record, I independently conclude that Sukumar established by a preponderance of the evidence that SRL's contacts in California— particularly between 1999 and 2003—were not "'random,' 'fortuitous,' or 'attenuated'" and were not the result of the "'unilateral activity of another party or a third person'" (see *Burger King Corp.*, *supra*, 471 U.S. at p. 475), but rather resulted from the concerted efforts of SRL to market and sell, "'directly or *indirectly*'" (see *Secrest Machine Corp.*,

---

performing it, and who follows the employer's 'desires only as to the results of the work, *and not as to the means whereby it is to be accomplished*.'"  (Italics added.)].)

9

*supra*, 33 Cal.3d at p. 670, italics added, quoting *World-Wide Volkswagen Corp.*, *supra*, 444 U.S. at pp. 297-298), its high-end exercise equipment and product to Sukumar.

I reach this conclusion based on the following undisputed evidence:

(1)  In October 1999, Sukumar received a telephone call from an individual who identified himself as Michael Taddese, SRL's export manager.  Taddese told Sukumar he had heard through SRL's distributor (not Eggers) that Sukumar was interested in SRL's state-of-the-art exercise equipment and products and asked Sukumar if there were any additional questions he needed answered about the equipment.

The majority notes that the trial court found Sukumar initiated this contact with SRL and that this finding is supported by substantial evidence in the record.  I have no qualm with that finding or the evidence supporting it, despite the majority's claim that I am improperly reweighing the evidence in this dissent.  Rather, my concern is the evidence largely ignored by the majority (under the guise of its substantial evidence standard of review), which I believe is highly relevant to purposeful availment.

With regard to this contact for example, the record shows that after Taddese called Sukumar, Taddese followed up on their conversation by faxing Sukumar a letter in October 1999 on Air Machine letterhead.  In this letter, Taddese stated SRL was "interested in continu[ing] the eventual relationship hoping both Companies have a mutual interest" and that SRL was "looking forward to hearing from you [e.g., Sukumar] soon."  Taddese's letter also stated SRL would be sending Sukumar a catalog of SRL's products, a flyer for its network system and operation manuals, among other items.

10

Although the record shows SRL at the time had a distributor working on its behalf, there is no mention in the October 1999 correspondence from Taddese about any such distributor or any suggestion that Sukumar was required to go through that distributor for information about SRL equipment and product. I believe a fair reading of this undisputed evidence shows that SRL was not merely "responding" to Sukumar's request for information, as the majority concludes, but rather that from the beginning of their relationship SRL was actively seeking to do business with Sukumar in the forum state.

(2) In March 2001, Sukumar attended the International Health, Racquet and Sportsclub Association trade show held in San Francisco, California. SRL operated a booth at this show as a means of advertising and promoting its product line in the United States.

Surprisingly, the majority fails to mention that Sukumar was also at this trade show and had his first in-person meeting there with SRL. Instead, the majority states that SRL attended the trade show because it was merely looking for "potential distributors around the world," as testified to in September 2008 by then SRL managing director Riccardo Piccioli, more than seven years after the show.

In reviewing Piccioli's deposition, I note he has no personal knowledge of the events in 2001 involving SRL, as he only became manager of SRL in 2005. In fact, Piccioli testified it was "very difficult" to prepare for his deposition because he was unable to locate people who had worked for SRL in 2001.

In any event, the record includes a memorandum prepared by Francesca Fantini, a member of SRL's export department in 2001 who actually attended the trade show. I

11

conclude Fantini's more or less contemporaneous summary to be much more credible than Piccioli's after-the-fact testimony regarding the purpose of SRL's participation in that show.

Among other things, Fantini noted that the trade show was the "most important American event in the sports club industry"; that a year earlier, the trade show had attracted 10,000 visitors "including health club, spa and gym proprietors, managers and operators"; that "[a]ll the major exhibitors from the sector were also there, [including] manufacturers of equipment, accessories and software to manage fitness programs"; and that "[c]rowds of the curious or those who are simply enthusiastic about the industry were practically non-existent [because] the show was by invitation only and badges were needed to enter." Fantini concluded in her report that the "impact" of SRL's booth "was more than satisfactory" based on the number of contacts SRL made at the show and that it helped SRL renew its image among competitors.

Fantini's summary in my view shows that SRL was doing much more in 2001 than merely looking for potential distributors for its state-of-the-art exercise equipment and product. Instead, this evidence shows SRL was also actively marketing its equipment and product in California, including to Sukumar who attended the trade show, and as such, was engaging in commercial activity in the forum state. (See *Crawford Laboratories*, *supra*, 50 Cal.App.4th at p. 1871.)

The majority states that I am improperly reweighing the evidence by considering Fantini's summary in light of Piccioli's deposition testimony that SRL was merely

12

looking for potential distributors at the trade show.  (Maj. opn. *ante*, at p. 25, fn. 8.)  I disagree.

First, I note the trial court never considered Fantini's summary.  As such, the trial court did not make any finding regarding this particular contact/activity by SRL.

Second, to the extent the majority believes we cannot consider Fanitini's summary—or other such evidence that was overlooked/not considered by the trial court—because of the "finding" of the trial court that Sukumar's evidence of purposeful availment was "unpersuasive" (maj. opn. *ante*, at p. 25) and/or because of the doctrine of implied findings applied by the majority (maj. opn. *ante*, at p. 26, fn. 9), then in my view this court has not conducted a meaningful review based on the entire record whether SRL purposefully availed itself of the benefits and protections of the forum state.

(3)  In September 2001, SRL directly sent updated product information and a price list to Frank Smith, an individual who had been hired as a consultant by Sukumar.  Smith lived in La Mesa, California at the time.  Later that same month, Smith received a copy of a proposal/price list from Eggers to Sukumar regarding the SRL equipment.  Taddese was also listed as receiving a copy of that proposal.

On the proposal, Eggers handwrote a short note to Taddese saying, "Here is my proposal to Sukumar."  Eggers's proposal included the unit prices for the "Hi-Tech" line of Air Machine exercise equipment manufactured by SRL that was of interest to Sukumar.  The proposal stated that "Air Machine [e.g., SRL] will have [its] chief engineer assist with your entire installation and set up, as well as provide 'hands on' detailed training sessions for your service personnel" and that the "issue of service is of

13

critical importance to the success of Air Machine, so your 'peace of mind' is *our* ultimate goal." (Italics added.)

Despite a voluminous record in this proceeding, I am unaware of any evidence of Taddese—or of anyone else from SRL, for that matter—*then* disavowing Eggers's statement that SRL would *not* be involved (i.e., "hands on") both in the installation of the SRL equipment Sukumar was contemplating purchasing or in the training of personnel to service such equipment. Rather, it was not until late in 2008, during the jurisdictional dispute, that SRL finally came forward with statements that Eggers alone was responsible for providing these important services.

The majority, in its summary of the evidence, states that as Eggers was making these contacts with Sukumar, Eggers was acting as an independent contractor of SRL as a result of the distributorship agreement between Eggers and SRL.[7] (Maj. opn. *ante*, at p. 5.) That agreement, however, was not signed until January *2004*. That Eggers *may* have become an independent distributor of SRL equipment and product in 2004 does not mean Eggers was acting in that capacity in September 2001 or going forward, or that Sukumar

---

[7] In any event, I note the language used by the parties to describe the nature of their legal relationship is "not dispositive" (*S.G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 349), and courts have disregarded formal documents purporting to create an independent contractor relationship when the "acts and declarations of the parties are inconsistent" with independent contractor status (*Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864, 877). Moreover, independent contractor status is generally a jury question when the evidence or inferences to be drawn from that evidence are in dispute. (*S.G. Borello & Sons, Inc. v. Department of Industrial Relations*, *supra*, at p. 349.)

14

somehow had constructive knowledge of the nature of the legal relationship (whatever it was) between Eggers and SRL until it was memorialized in January 2004.

Moreover, even if Eggers was in fact an independent contractor of SRL in 2001, that would not preclude a finding of purposeful availment by SRL given the evidence that SRL was seeking to sell its state-of-the-art exercise equipment to Eggers *and* knew Eggers was actively targeting Sukumar, a California resident, and that SRL and Eggers were involved in a coordinated effort to sell such equipment to Sukumar. (See *Crawford Laboratories*, *supra*, 50 Cal.App.4th at p. 1871.)

(4) The record shows that SRL's export manager and product specialist, Michael Taddese and Davide Sanson, respectively, at Eggers's request came to San Diego in May 2002 to meet directly with Sukumar to discuss SRL equipment and product. William Stout, who at the time owned his own fitness supply and service company in San Diego, also participated in that meeting as one of Sukumar's consultants.

During this meeting, either Taddese or Sanson gave Sukumar various materials from SRL, including a "Guarantee" providing that "Air Machine" guaranteed its "products against manufacture defects and defective components" for "2 years" for "mechanical and pneumatic parts and painting" and "1 year" for "electronic parts and compressor." The trial court's order granting SRL's motion to quash is silent regarding the guarantee.

In support of SRL's reply to Sukumar's opposition to the motion to quash, SRL also submitted the October 2008 declaration of Tomas Bilardo. Bilardo testified he was an employee of SRL from 2002 to 2007. According to Bilardo, "SRL did not warranty

15

products except to buyers of the same products, i.e.[,] for foreign markets to distributors. The distributor was under the contractual duty to warrant and provide assistance to its clients. This is the meaning of [the word] 'guarantee'" in the document SRL gave Sukumar in 2002.

I find SRL's representation of the meaning of the word "guarantee" to be disingenuous at best. In reviewing the distributorship agreement executed between Eggers and SRL in the record, I find nothing therein expressly stating that Eggers was contractually bound to warrant the equipment manufactured by SRL.[8]

Moreover, because Eggers did not sign the distributorship agreement with SRL until January 2004, to accept Bilardo's statement regarding the meaning of the word "guarantee" would require there to have been an *oral* agreement between Eggers and SRL in May 2002 that included, among its terms, such an obligation.

Even if this was the case, however, there is strong support in the record that Sukumar was not told *before* he purchased the SRL equipment in 2004 that Eggers alone allegedly warranted that equipment, given the overwhelming evidence in the record of Sukumar's concerns about purchasing medical-grade exercise equipment from a company outside the United States. I conclude the guarantee given by SRL to Sukumar during the

---

[8]    The distributorship agreement references various annexes (i.e., attachments) to that agreement. However, none of the annexes are included in the record. It is conceivable that the contractual obligation of a distributor to warrant to third-party purchasers of SRL equipment and product was included in one of these annexes (if they ever existed).

16

May 2002 meeting—which was not considered by the trial court (and thus, by the majority)—is compelling evidence of SRL's purposeful availment in the forum state.[9]

(5) Sukumar testified that Taddese and Sanson urged Sukumar during the May 2002 meeting to purchase SRL equipment, noting that such equipment was of "high quality." I am unaware of any conflict in the evidence on this point and note the trial court did not consider such evidence in finding no purposeful availment by SRL.

Sukumar testified he told Taddese and Sanson that he would not purchase any SRL equipment unless there was a factory-trained technician in San Diego to address maintenance and repair issues involving the equipment. According to Sukumar, Taddese and/or Sanson in response agreed that SRL would train Stout at its factory in Italy in order for Stout to service the equipment following its delivery in California. According to the trial court, because Sukumar insisted that Stout be trained, this fact cuts against a finding of purposeful availment by SRL. I disagree.

Sukumar also testified that during this meeting, Taddese stated that SRL needed a showroom in the United States for its equipment and product and suggested that one of the rehabilitation clinics that Sukumar was contemplating opening could be used for that purpose. SRL denied it made any such overtures to Sukumar during this meeting and instead contended it was *Sukumar* who offered to allow SRL to use one of Sukumar's

---

9    At the risk of being repetitive, I note the majority does not consider the "guarantee" evidence ostensibly because to do so would violate the substantial evidence standard of review and the doctrine of implied findings it mechanically applies to the purposeful availment issue.

proposed clinics for this purpose. Other than the generalized finding that Sukumar initiated many of the contacts with SRL and not vice versa, the trial court made no specific finding regarding this conflicting evidence.

The majority references the May 2002 meeting between Sukumar, Sanson, Taddese, Eggers and Stout in San Diego and notes the conflict in the evidence between the parties regarding the purpose of the meeting, what was said and other particulars. (Maj. opn. *ante*, at p. 7.)

Taddese testified that to allay Sukumar's concerns regarding spare parts for the SRL equipment Sukumar contemplated purchasing, Sukumar was told during the May 2002 meeting that the distributor was required "to maintain adequate spare parts." I find this evidence not credible, since as noted *ante*, the distributorship agreement between Eggers and SRL was not executed until *2004.*[10]

Taddese also testified that there was never a representation made to Sukumar along the lines that SRL was "behind" Eggers during this meeting or at any time during the parties' dealings, for that matter.

I find Taddese's after-the-fact representation not credible when viewed in light of the entire record. For one thing, if SRL was not "behind" Eggers as Taddese testified,

---

[10]    If there was an *oral* distributorship agreement in 2002 between Eggers and SRL, as noted *ante*, there is no evidence in the record showing that Sukumar *then*, in contrast to in 2008, would have known or have been deemed to know the terms of such an agreement.

18

why then did Taddese and Sanson travel to San Diego *with Eggers* in 2002 to meet with Sukumar in person?

Additionally, I find it difficult to reconcile Taddese's 2008 testimony with the August 2001 letter to Eggers sent by SRL's then managing director Gian Andrea Oberegelsbacher. In that letter, Oberegelsbacher confirmed SRL was "enthusiastic" about the development of the U.S. market and promised Eggers it would provide him "maximum support" in order to achieve "*together* important results" in that marketplace. (Italics added.) This evidence from 2001 completely undermines SRL's position in 2008 that it did not stand behind Eggers.

Furthermore, the record shows that in 2003 SRL actually prepared for Eggers's use two separate purchase offers to Sukumar for the purchase of SRL equipment and product. Unlike the majority, I believe the offers SRL prepared for Eggers are highly relevant to the purposeful availment issue, as they show not only SRL's direct involvement in economic activity in the forum state, but also show a coordinated effort between Eggers, an intermediary, and SRL to engage in such activity in the state. (See *Bridgestone Corp.*, *supra*, 99 Cal.App.4th at p. 776 [purposeful availment established where a nonresident defendant sold tires to "California distributors" and made "other efforts to market a product to customers in this state indirectly through an intermediary"].)

19

(6)  During the May 2002 meeting in San Diego, Sukumar discussed the status of certain "projects" between Sukumar and SRL.[11]  The trial court's order granting the motion to quash of SRL is silent regarding the research projects and their significance to the purposeful availment inquiry.

In any event, although the projects never proceeded to conclusion, Sukumar testified he was impressed by SRL's work on them and that such work was an "important consideration" in his decision to purchase SRL product:

"I had purchased weight-stack fitness equipment from the Nautilus corporation that I wanted to have modified to also function based on air resistance.  I told SRL's Mr. Taddese that I was considering SRL's main competitor in the United States, the Keiser Corporation, for that project.  Mr. Taddese said that SRL could do that work with a greater attention to quality.  In addition, I mentioned to Mr. Taddese that I may need to have each weight stack on the Nautilus range of motion machines tested, calibrated and labeled with the maximum weight experienced by the user during exercise.  Mr. Taddese

---

[11]     SRL submitted evidence disputing there was any "agreement" between it and Sukumar regarding any proposed testing or study of exercise equipment.  The trial court did not make any finding with respect to this factual dispute.  However, the trial court granted SRL's objection to the facts in Sukumar's declaration that he and SRL were working on various projects together.  On closer inspection, I note the record shows SRL *only* objected to such evidence based on what it described as "[d]isputed facts."  To the extent the record unambiguously shows the trial court sustained proper *evidentiary* objections to the evidence proffered by either party, as a court of review we are bound to adhere to those determinations, given that neither party has challenged them on appeal.  But to the extent an objection was sustained based on "disputed facts" or on other improper bases, I conclude a reviewing court may properly consider such evidence, as I have done here.

said that SRL personnel, especially Mr. Sanson, had substantial experience with respect to static 'weight-to-user'/'resistance-to-user' calibration, and could also help me with that project. Mr. Taddese added that the experience gained by SRL in determining the weight-to-the-user calibration on my Nautilus machines would help SRL to do a better job on the air hybridization project. On June 25, 2002, Mr. Sanson sent Mr. Eggers an email that Mr. Eggers sent to me indicating that SRL was working on the research project for me and estimating the testing could be done by September 2002. [See Exhibit 17, which was attached to the Notice of Lodgment.] [¶]

"The testing on these projects had not been completed by the time of the . . . San Diego meeting that I attended with Mr. Sanson and Mr. Taddese. But they both assured me that SRL was working on the best way to proceed with these projects, and we discussed some possible testing protocols that could help bring the efforts to conclusion. I was impressed with the work and thinking that SRL had done on these projects as I compared that to what the Keiser and Nautilus companies had done. Although the projects never proceeded to a conclusion, SRL's demonstrated capabilities in this area[] were an important consideration for me in deciding to contract with SRL for the purchase of an entire line of its air resistance products."

The majority notes the existence of the research projects and cites to Sanson's declaration, which states that as a "courtesy" Sanson put Sukumar in touch with some university professors in Italy to conduct various testing protocols, but that SRL had absolutely nothing to do with these projects.

21

However, the June 25, 2002 email by Sanson (sent from his "air machine" address) to Eggers is included in the record.[12] Sanson starts off the email by recognizing that Eggers was "worried" about the research projects being done for Sukumar, presumably because Eggers knew—as Sukumar so testified—that SRL's work on those projects was an important consideration to Sukumar as he looked to purchase medical-grade exercise equipment from SRL and/or from its competitors. In addition, the email states that by September 2002 "*we* will be ready to come over to measure Sukumar's machines" to complete the testing. (Italics added.)

From my review of the entire record, I find that SRL's version of events regarding the various "research projects,"—including that SRL had nothing to do with them and that, to the extent Sanson was involved in them, it was merely as a "courtesy" to Sukumar—is unsupported by the evidence in the record. Instead, I believe the email from Sanson to Eggers, which was forwarded by Eggers to Sukumar, at a minimum,

_____

[12]    We are not precluded from considering this exhibit on appeal because the record shows the trial court never ruled on *any* of SRL's objections to the exhibits and because SRL did not renew its objection to this or any other exhibit, or otherwise challenge the use of the exhibits, in this proceeding. In any event, even if the issue was preserved on appeal, I would overrule SRL's objection to this exhibit. That objection was based solely on the ground that, because SRL had not yet been served in the action and was not in attendance at the deposition of Eggers (where this exhibit was discussed), the exhibit (as opposed to any of Eggers's deposition testimony about the exhibit) allegedly could not be considered in connection with the motion to quash. (See Code Civ. Proc., § 2025.620.) Moreover, the record shows SRL relied extensively on Eggers and his testimony in support of its motion to quash, and Sukumar testified under penalty of perjury he actually received the exhibit on or about June 25, 2002 from Eggers (which testimony was not opposed by SRL).

shows SRL's involvement in such projects, inasmuch as just months earlier Sanson along with Taddese had met with Sukumar in San Diego, where those projects had been discussed.

My conclusion is bolstered by Eggers in his writing to Sukumar at the end of this email, wherein Eggers invited Sukumar to contact Sanson *directly* with any questions or concerns regarding the testing.

Finally on this issue, I note yet again the lack of any evidence in the record of Sanson and/or anyone else from SRL *then* stating that Sukumar needed to work through Eggers regarding the "research projects" or disavowing SRL's involvement in such projects. That only came much later, after SRL was sued. In my view, this evidence supports a finding that SRL *then* was engaged in commercial activity in the forum state.

(7) Eggers sent Sukumar additional proposals in 2003, including one for the purchase of about $136,000 of SRL equipment and product. This proposal, prepared on Air Machine letterhead, identified Eggers and his company as SRL's "U.S. Office" and included a diagram prepared by SRL's Sanson showing the positioning of SRL's entire "Hi-Tech" line of equipment at Sukumar's facility located in Solana Beach, California. This proposal included a guaranty or warranty that was similar to the one Sukumar had been given by Taddese and Sanson in the May 2002 meeting in San Diego and confirmed that once Sukumar purchased the equipment from Eggers, Stout would travel to SRL's Italian factory to be "trained and certified as a professional Air Machine technician."

Again, I am not aware of any evidence in the voluminous record of SRL *then* disavowing Eggers's statements in this proposal that Eggers was SRL's "U.S. Office" or

23

that Stout would travel to Italy and be trained and certified *by SRL* to service the exercise equipment.

Moreover, even if SRL did the diagram for Eggers and not "directly for Sukumar," as found by the trial court, I conclude the diagram and this proposal in general are compelling evidence of purposeful availment by SRL, as SRL was using Eggers as an intermediary to engage in commercial activity in the forum state. (See *Bridgestone Corp.*, *supra*, 99 Cal.App.4th at p. 776.)

(8) Eggers sent Sukumar a revised proposal on Air Machine letterhead in December 2003 reiterating many of the same terms included in the August 2003 proposal. Although Taddese testified that Sukumar (allegedly) was told during the May 2002 San Diego meeting that the distributor was contractually obligated to provide spare parts for SRL equipment, the December 2003 proposal included a term requiring "Air Machine" to provide such parts for a period of two years based on any "needed warranty parts and work" and thereafter, the customer could purchase at the "distributor['s] cost and freight" any additional parts for the product. As before, there is nothing in the record then from SRL stating it would not provide such spare parts, as referenced by Eggers.

(9) After Sukumar purchased the SRL equipment, SRL shipped spare and replacement parts directly to Sukumar's consultant (i.e., Stout) here in San Diego.

Based on my review of the entire record, I independently conclude that SRL, by its own activities and through the activities of Eggers, an intermediary, intentionally sought the benefits of the forum state in its quest to market and sell its medical-grade exercise equipment to Sukumar. (See *Buckeye Boiler Co. v. Superior Court* (1969) 71 Cal.2d 893,

24

901–902, 903 [equating the "purposeful availment" requirement with engaging in economic activity in California as a matter of "economic reality"]; *Hoffman-LaRoche*, *supra*, 130 Cal.App.4th at p. 794 [noting the "ultimate question whether jurisdiction is fair and reasonable under all the circumstances . . . is a legal determination warranting *independent* review" (Italics added.)].)

2. *SRL Is Subject to Jurisdiction Even if It (Allegedly) Sought to Distance Itself Legally from the Forum State*

In invoking the substantial evidence standard of review to support the finding of the trial court that there was no purposeful availment by SRL, and in abandoning the rule that jurisdiction is, in essence, a question of law (*CenterPoint*, *supra*, 157 Cal.App.4th at pp. 1117-1118), the majority concludes substantial evidence supports the finding of the trial court that SRL "made every effort to distance itself legally from the California market." (Maj. opn. *ante*, at p. 22.)

As a threshold matter, I believe the trial court and the majority improperly focus on what SRL allegedly tried to do to avoid jurisdiction, as determined with 20-20 hindsight, instead of looking at SRL's activities in the forum state at the time of such activities in determining whether SRL engaged in sufficient commercial activity to be subject to suit in California.

In any event, the trial court found significant to the purposeful availment analysis that SRL refrained from signing any contracts with residents from California or from other states. (Maj. opn. *ante*, at p. 22.) However, this fact is largely irrelevant to the issue of specific jurisdiction, which analyzes SRL's activities with respect to Sukumar

25

and Sukumar's claims. In any event, while it is true that SRL did not sign an agreement with Sukumar, including the proposed addendum, as summarized *ante*, there is sufficient other evidence of SRL's commercial activities in the forum state that in my view establish purposeful availment by SRL.

Moreover, although SRL did not sign a contract to sell Sukumar SRL equipment and product, Eggers did. As also noted *ante*, there is compelling evidence that SRL acted through Eggers, an intermediary, in marketing and selling in this state its high-end exercise equipment and products to Sukumar. (See *Bridgestone Corp.*, *supra*, 99 Cal.App.4th at p. 776; see also *Crawford Laboratories*, *supra*, 50 Cal.App.4th at p. 1871.)

Second, while recognizing the legal principle that activities taken on behalf of a nonresident defendant may be attributed to that defendant for jurisdictional purposes, the majority concludes that other than the fact SRL provided Eggers with Sukumar's contact information, Sukumar proffered no evidence to show that Eggers's activities in California were attributable to the efforts and activities of SRL. (Maj. opn. *ante*, at p. 23). I disagree.

Again, as summarized *ante* the record shows that at least between 2001 and 2004, SRL was a "primary participant" (see *Burger King Corp.*, *supra*, 471 U.S. at p. 479, fn. 22) in a coordinated effort with Eggers to market and sell SRL equipment and product to Sukumar.

Third, the trial court found that SRL sought to distance itself from the California market based on the terms of the distributorship agreement, including the term that

26

Eggers had no authority to bind SRL and that Italian law governed any dispute arising under that agreement.  (Maj. opn. *ante*, at p. 24.)  The majority also find significant the fact that Sukumar and Eggers sought to include SRL on the addendum to the purchase agreement, which SRL never signed.  (*Ibid.*)

Candidly, the distributorship agreement in my view has limited significance in the jurisdictional analysis.  For one thing, Eggers and SRL did not sign the agreement—e.g., formalize their legal relationship—until January 2004.  The record shows, however, that Eggers was contacting Sukumar on behalf of, and in conjunction with, SRL as early as September 2001 regarding Sukumar's interest in and ultimate purchase of SRL equipment and product.  For another thing, Sukumar was neither a party to the distributorship agreement nor was he bound by its terms.[13]

Furthermore, whether or not Sukumar is precluded under the distributorship agreement or by operation of law either from suing SRL or from succeeding in such a suit is altogether irrelevant in the jurisdictional inquiry.  (See *Anglo Irish Bank Corp., PLC v. Superior Court*, *supra*, 165 Cal.App.4th at p. 983 ["The proper jurisdictional question is not whether the defendant can be liable for the acts of another person or entity under state

---

[13]    On the one hand, SRL argues that we *should* consider the terms of the distributorship agreement between SRL and Eggers even though Sukumar was *not* a party to that agreement or bound by its terms.  On the other hand, SRL argues that we *should not* consider the terms of the purchase agreement between Eggers and Sukumar, which the evidence shows was the culmination of the coordinated efforts of SRL and Eggers, because SRL was neither a party to that agreement (or the addendum to that agreement) nor was it bound by its terms.  In my opinion, SRL simply cannot have it both ways.

substantive law, but whether the [nonresident] defendant has purposefully directed its activities at the forum state . . . ."]; see also *Epic Communications, Inc. v. Richwave Technology, Inc.* (2009) 179 Cal.App.4th 314, 329 ["[L]ocal substantive law concerning liability does not control the jurisdictional analysis, which at bottom is concerned with "'fair play and substantial justice.""'].)

Fourth, the trial court found that SRL sought to distance itself from the California market because Eggers alone was responsible for shipping from Italy the SRL equipment and product purchased by Sukumar. (Maj. opn. *ante*, at p. 24.) I believe this fact has de minimis jurisdictional significance in light of all the other evidence in the record showing SRL's commercial activities in the forum state, including evidence that, after Sukumar purchased the equipment, SRL shipped replacement parts directly to Sukumar (through Stout).

In sum, based on my review of the entire record, I independently conclude that Sukumar established SRL purposefully availed itself of the benefits and protections of the forum state.

C. *Forum Relatedness*

The second prong of the three-prong test for specific jurisdiction, known as the "the relatedness requirement," addresses "whether the controversy is related to or arises out of defendants' contacts with California." (*Snowney v. Harrah's Entertainment, Inc.* (2005) 35 Cal.4th 1054, 1067.) The relatedness requirement is determined under the "substantial connection test," which "is satisfied if 'there is a substantial nexus or

28

connection between the defendant's forum activities and the plaintiff's claim.' [Citation.]"
(*Id.* at p. 1068.)

Our high court has clarified that under the substantial connection test, "'the intensity of forum contacts and the connection of the claim to those contacts are inversely related.' [Citation.] '[T]he more wide ranging the defendant's forum contacts, the more readily is shown a connection between the forum contacts and the claim.' [Citation.] Thus, '[a] claim need not arise directly from the defendant's forum contacts in order to be sufficiently related to the contact to warrant the exercise of specific jurisdiction.' [Citation.] . . . Indeed, ""[o]nly when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from that [contact]."" [Citations.]" (*Snowney v. Harrah's Entertainment, Inc.*, *supra*, 35 Cal.4th at p. 1068; see also *Vons*, *supra*, 14 Cal.4th at p. 455.)

Applying this test, I believe Sukumar's claims have a substantial connection with SRL's contacts with, and activities in, California. (See *Hoffman-LaRoche*, *supra*, 130 Cal.App.4th at p. 794.) Sukumar's causes of action for breach of contract, breach of warranty and for unfair competition against SRL each allege that the SRL product Sukumar purchased was defective in various particulars and that SRL failed to remedy these defects with resulting injury to Sukumar.

Because the operative facts of the controversy and the harm Sukumar alleges he sustained relate to SRL's activities—either directly or through its distributor, Eggers—in California in connection with the marketing, sale and servicing of that *same* product, I

have little difficulty concluding Sukumar satisfied the second prong for specific

jurisdiction.  (See *Snowney v. Harrah's Entertainment, Inc.*, *supra*, 35 Cal.4th at p. 1068.)

D.  *Fairness*

"Even if minimum contacts are present, an assertion of jurisdiction by California

over a nonresident company is improper if it would not comport with fair play and

substantial justice.  [Citation.]  Factors relevant to this determination include '"'the burden

on the defendant,' 'the forum State's interest in adjudicating the dispute,' [and] 'the

plaintiff's interest in obtaining convenient and effective relief . . . .'"'  [Citation.]  The

defendant bears the burden of presenting a 'compelling case' showing that subjecting it to

suit in California would be unreasonable.  (*Burger King Corp.*[, *supra*,] 471 U.S. [at p.]

477; *Vons*[, *supra*,] 14 Cal.4th [at p.] 476.)"  (*West Corp. v. Superior Court* (2004) 116

Cal.App.4th 1167, 1178 (*West Corp.*).)

Here, the trial court erred when it placed the burden on Sukumar to show

California's exercise of specific jurisdiction over SRL would be *reasonable*, when in fact

it was SRL's burden to show the exercise of jurisdiction over it would be *unreasonable*.

(See *West Corp.*, *supra*, 116 Cal.App.4th at p. 1178.)  I conclude SRL has not satisfied *its*

burden.

I reject SRL's argument that it would be unreasonable to exercise specific

jurisdiction over it because the action involves a "breach of contract to which SRL is not

a party and under which SRL has no obligation."  This argument goes to the merits of the

30

action and is not germane in assessing whether the exercise of jurisdiction over SRL would be unfair.[14]  (See *Hoffman-La Roche*, *supra*, 130 Cal.App.4th at p. 794.)  I also reject SRL's argument that the "nature" of the action "involves minor issues of alleged paint defects and whether one multipurpose machine (the Venere) was to be compatible with interconnective software from the other line of machines," as it too goes to the merits of the action.  (See *ibid.*)

I further reject SRL's arguments that the exercise of jurisdiction over it would be unreasonable because (i) SRL relied on Italian/European law to set up an independent distributorship to avoid "obligating itself to contract provisions or representations made by that distributor," and (ii) Sukumar was the aggressor in the pursuit of SRL's product. These arguments appear to relate more to the issue of purposeful availment than to the issue of reasonableness.  In any event, they ignore the principle that when a nonresident defendant engages in activities in a forum that amount to purposeful availment, it is not unreasonable to subject the nonresident defendant to suit in that forum.  (See *World-Wide Volkswagen Corp.*, *supra*, 444 U.S. at p. 297 ["When a corporation 'purposefully avails itself of the privilege of conducting activities within the forum State,' [citation], it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State."].)

---

14      See also footnote 13, *ante*.

I also reject the argument of SRL that, because Sukumar allegedly admitted it would be inconvenient for him to litigate this action in Italy, based on that same reasoning it would be unfair and violate due process to require SRL to litigate this action in California. Whether it would be reasonable or unreasonable, convenient or inconvenient, for Sukumar to litigate this action in Italy, however, is altogether irrelevant to the issue of whether SRL satisfied *its* burden to present a "compelling case" that California's exercise of jurisdiction over it would be unreasonable. (See *West Corp.*, *supra*, 116 Cal.App.4th at p. 1178.)[15]

Conversely, I conclude Sukumar's interest in obtaining convenient and effective relief, and California's interest in adjudicating the instant dispute, support jurisdiction in California. (See *West Corp.*, *supra*, 116 Cal.App.4th at p. 1178.) For one thing, the alleged defective exercise equipment, which is the subject of the dispute between the parties, is located in California.

For another thing, California has a "strong interest" in enforcing contracts (e.g., the purchase agreement between Sukumar and Eggers) to be performed within the state (see *Luberski, Inc. v. Oleificio F.LLI Amato S.R.L.* (2009) 171 Cal.App.4th 409, 419) and

---

[15] I also reject SRL's other arguments that it would be unreasonable to subject it to suit in California, including the argument that (1) litigating in California would be burdensome for SRL because, among other reasons, it former employees are spread out over Italy and in other countries; (2) the forum selection clause in the distributorship agreement states Italy shall have exclusive jurisdiction of any dispute arising under that agreement; and (3) Sukumar allegedly engaged in bad faith litigation tactics in an effort to establish jurisdiction over SRL.

32

in "opening its courts to residents seeking redress," particularly when, as in the instant case, the only alternative would be to litigate the action against SRL in Italy. (See *Buckeye Boiler Co. v. Superior Court*, *supra*, 71 Cal.2d at p. 899; see also *Crawford Laboratories*, *supra*, 50 Cal.App.4th at pp. 1869-1870 [concluding the trial court erred when it found jurisdiction was unfair after comparing the sales of the nonresident defendant in California to sales world-wide because courts must focus on the "nature and quality of the activity in the forum state, not the quantity," and concluding if the rule was otherwise, "states would be unable to provide their injured citizens with redress against large companies because the sales in any one state would represent a small fraction of the company's total revenue"].)

I therefore would conclude SRL has failed to make a compelling case to show California's exercise of jurisdiction over it would be unreasonable and violate due process.[16]

BENKE, Acting P. J.

---

[16] Unlike the majority, I deem it unnecessary to decide whether SRL waived its jurisdictional objection by allegedly engaging in discovery that was unrelated to jurisdiction.